770 So.2d 908 (2000)
STATE of Louisiana
v.
Mark MORRIS.
No. 99KA3075.
Court of Appeal of Louisiana, First Circuit.
November 3, 2000.
*912 Doug Moreau, District Attorney, Baton Rouge by R. Christopher Nevils, Assistant District Attorney, Baton Rouge, Counsel for Appellee State of Louisiana.
Kathy Flynn Simino, Baton Rouge, Counsel for Defendant/Appellant Mark Morris.
Before: CARTER, C.J., WEIMER, and KLINE,[1] JJ.
WEIMER, J.
Defendant, Mark Morris, was indicted by the East Baton Rouge Parish grand jury for possession of a firearm by a convicted felon, in violation of LSA-R.S. 14:95.1; four counts of armed robbery, in violation of LSA-R.S. 14:64; aggravated kidnapping, in violation of LSA-R.S. 14:44; and second degree murder, in violation of LSA-R.S. 14:30.1.[2] He was tried by a jury, which convicted him as charged on all counts. He was sentenced as follows: count 1, possession of a firearm by a convicted felon, ten years at hard labor; counts 2-5, armed robbery, seventy-five years at hard labor on each count; count 6, aggravated kidnapping, life imprisonment at hard labor; and count 7, second degree murder, life imprisonment at hard labor. The court ordered each of the sentences to be served without benefit of probation, parole, or suspension of sentence and with credit for time served as applicable. The court further ordered that the sentences for counts 6 and 7 were to be served concurrently, and the sentences for counts 1 through 5 were to be served concurrently with each other but consecutively to the life sentences. Defendant appealed, urging eleven assignments of error in five arguments.
These charges arose from a robbery at a Winn-Dixie Supermarket in Baton Rouge, Louisiana. With the assistance of two accomplices, John Green and Jonathan Molden, defendant robbed the supermarket manager and several customers of the store. Green waited in the parking lot with the getaway vehicle while Molden and defendant entered the store. Molden robbed customers and took money from a cash register at the front of the store as defendant entered the manager's office and forced the manager at gunpoint to open the safe. Police officers arrived on the scene while the robbery was in progress. Molden and Green fled in the getaway car and were captured several blocks away. Defendant kidnapped Jacqueline Purdue, a store employee, who arrived at the store to begin her shift moments after Molden and Green fled. Purdue's body was found in St. Gabriel, Louisiana, approximately one hour later, and her abandoned car was recovered in Baton Rouge the next day. Defendant was arrested five and one-half hours after the robbery when he attempted to retrieve a second vehicle used by the conspirators that had been left *913 in the parking lot of a motel near the supermarket.

MISJOINDER AND SEVERANCE
(Assignments of Error 1, 2, 3, 4, 6 and 7)
In these assignments of error, defendant claims the trial court erred by refusing to sever the charge of felon in possession of a firearm from the remaining offenses. Defendant claims joinder of this offense was improper and prejudicial because it allowed the jury to hear the otherwise inadmissible evidence that he was a convicted felon. The State introduced evidence that defendant pled guilty to a charge of first degree robbery in June of 1994.
Defense counsel complained of the joinder of the felon in possession of a firearm count through various means, including a motion to quash the charge and several motions to sever the offenses. During trial, counsel vehemently objected to the introduction of the evidence and even refused to cross-examine the State's witnesses whose testimony established the prior conviction. On appeal, defendant now argues that the lack of jurisprudence on the issue conclusively establishes that trial courts routinely sever these charges before trial; or, if the trial court refuses a motion to sever, an appellate court will reverse that ruling on supervisory review.
We find defendant's arguments unpersuasive. We have found no published jurisprudence directly addressing this issue. However, while some appellate decisions incidentally indicate that a felon in possession charge was severed from other offenses before trial, other decisions reflect that a felon in possession charge was jointly tried with other offenses or even tried in a separate proceeding, but at the same time as other offenses.[3]
Louisiana Code of Criminal Procedure article 493 provides for the joinder of two or more offenses, as follows:
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.
"If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires." LSA-C.Cr.P. art. 495.1.
A defendant in any case bears a heavy burden of proof when alleging prejudicial joinder of offenses as grounds for a motion to sever; factual, rather than conclusory, allegations are required. State v. Davis, 92-1623, p. 9 (La.5/23/94), 637 So.2d 1012, 1019, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994). In ruling on a motion for severance, the trial *914 court must weigh the possibility of prejudice to the defendant against the important considerations of economical and expedient use of judicial resources. State v. Brooks, 541 So.2d 801, 804 (La.1989). An appellate court will not reverse the trial court's ruling denying a motion for severance absent a clear showing of prejudice. State v. Machon, 410 So.2d 1065, 1068 (La.1982); See State v. Allen, 95-1515, p. 5 (La.App. 1 Cir. 6/28/96), 677 So.2d 709, 713, writ denied, 97-0025 (10/3/97), 701 So.2d 192.
Because all of the charged offenses were triable by the same number of jurors and required the same concurrence, joinder was not improper; because the use of a weapon is an essential element of the armed robbery charges, evidence that defendant was armed also was not improper. Thus, the only question is whether the introduction of evidence of defendant's prior conviction for first degree robbery was so prejudicial that the trial court's failure to sever that count was an abuse of discretion.
As a general rule, evidence of criminal conduct that takes place in a series of events is admissible at the trial of one of the offenses. See LSA-C.E. art. 404(B). See also State v. Colomb, 98-2813, pp. 1-2 (La.10/1/99), 747 So.2d 1074, 1075. Any time the State introduces evidence of other criminal activity by the accused, the possibility exists that the trier of fact will be affected to some degree by the evidence; for that reason, the State must be mindful of the circumstances in which it elects to try a charge of felon in possession of a firearm with other substantive offenses to insure that justice is served. Nevertheless, there is no absolute ban on the introduction of evidence of other unrelated crimes, including felony convictions; instead, statutory and jurisprudential guidelines establish the circumstances under which this evidence is admissible. See LSA-C.E. arts. 403; 404(B). See also State v. Prieur, 277 So.2d 126, 130 (La. 1973). Herein, the jury was properly instructed, after the presentation of the evidence and again during the general instructions, that the evidence of defendant's prior conviction was admitted only to establish the elements of one of the charged offenses and not as evidence bearing on defendant's character.
In ruling on a motion for severance, the trial court should consider a variety of factors to determine if prejudice may result from the joinder: whether the jury would be confused by the various counts; whether the jury would be able to segregate the various charges and the evidence; whether the defendant could be confounded in presenting his various defenses; whether the crimes charged would be used by the jury to infer a criminal disposition; and whether, considering the nature of the offenses, the charging of several crimes would make the jury hostile. State v. Gaines, 633 So.2d 293, 297 (La.App. 1 Cir.1993), writ denied, 93-3164 (3/11/94), 634 So.2d 839.
Considering the Gaines criteria, we find the defendant did not establish that the evidence of the firearms charge was likely to confuse the jury and make the jury unable to segregate the charges and evidence, because the charges and evidence pertinent to each of the crimes charged were easily distinguishable. The defense concentrated on alibi (through evidence of affidavits by Molden and Green that defendant was not with them during the robbery) and, to some extent, discrediting the testimony of the State's witnesses. Introduction of evidence of a prior conviction did not confound the various defenses. The remaining factors require the determination of whether the crimes charged would be used by the jury to infer a criminal disposition or, when considering the nature of the offenses, the joinder of the crimes would make the jury hostile.
Defendant claims the charge was included so the jury would learn he had a prior conviction and infer that he had a criminal disposition. The State claims the charge *915 was included because the jury might not convict defendant of the other charges. We find defendant has offered only conclusory allegations and failed to meet the burden of establishing prejudicial joinder. The trial court's instructions, both after the presentation of the evidence and during general instructions, that the evidence of defendant's prior conviction was admitted only to establish an element of the felon in possession of a firearm charge and not as evidence of defendant's character, limited any prejudice.
In any event, even if we were to find the trial court erred in refusing to sever the felon in possession of a firearm charge, the erroneous admission of other-crimes evidence is a trial error subject to harmless-error analysis on appeal. State v. Johnson, 94-1379, p. 15 (La.11/27/95), 664 So.2d 94, 101. The test for determining whether an error is harmless is whether the verdict actually rendered in this case "was surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); Johnson, 94-1379 at 14, 664 So.2d at 100.
The State's evidence included testimony by: two customers, neither of whom was able to positively identify defendant as a perpetrator, but who both testified Molden was accompanied by another man dressed totally in black; defendant's two accomplices, who admitted that they planned and participated in the robbery with defendant; and the store manager, who testified he was absolutely positive defendant was the person who held a gun to his head and threatened to kill him while he tried to open the safe. Given the extensive direct evidence of the armed robberies, the verdicts on those charges could not have been related to evidence of any prior conviction of defendant.
There were no eyewitnesses to the abduction and murder of Ms. Purdue. However, as discussed later, defendant was clearly connected to those offenses through circumstantial evidence. Any possibility that the jury was prejudiced against defendant because of his prior conviction is so remote as to render the verdicts surely unattributable to the evidence.
Accordingly, under these circumstances, we find no merit in defendant's claim that the trial court erred in refusing to sever the charge of felon in possession of a firearm.

CHANGE OF VENUE

(Assignment of Error No. 5)
In this assignment of error, defendant contends the trial court erred in denying his motion for change of venue. Defendant claims that he could not receive a fair and impartial trial because of the widespread publicity about the case and the resulting prejudice.
A defendant is guaranteed an impartial jury and a fair trial. LSA-Const. art. 1, § 16. Accordingly, a change of venue may be ordered when a defendant establishes that he or she will be unable to obtain an impartial jury or a fair trial at the place of original venue.
Generally, the defendant bears the burden of showing actual prejudice. State v. Vaccaro, 411 So.2d 415, 424 (La. 1982). Whether the defendant has made the requisite showing of actual prejudice is a question addressed to the trial court's sound discretion, the exercise of which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion. State v. Wilson, 467 So.2d 503, 512(La.), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985). A change of venue shall be granted when the applicant proves that, by reason of prejudice existing in the public mind, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending. LSA-C.Cr.P. art. 622.
The factors to be evaluated to determine if actual prejudice exists and a change in venue is necessary include: (1) *916 the nature of pretrial publicity and the degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. State v. Bell, 315 So.2d 307, 311 (La.1975); See State v. Hoffman, 98-3118, p. 5 (La.4/11/2000), 768 So.2d 542, 551; cert. denied, ___ U.S. ___, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000).
"The length to which the trial court must go in order to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality." Murphy v. Florida, 421 U.S. 794, 802-803, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975). However, because a defendant is not entitled to a jury that is entirely ignorant of his case, he cannot meet his burden by merely showing a general level of public awareness of the case. State v. Thompson, 516 So.2d 349, 352 (La.1987). The number of jurors excused for cause because of having a fixed opinion is a gauge of whether prejudice exists in the public mind. See Murphy v. Florida, 421 U.S. at 803, 95 S.Ct. at 2037-2038 (the court found that excusing twenty of seventy-eight venire persons because of opinion of defendant's guilt did not justify venue change). See also State v. Connolly, 96-1680, pp. 5-6 (La.7/1/97), 700 So.2d 810, 815 (the court found no need for venue change where 120 out of 139 potential jurors possessed some knowledge about the crime, but most had only a vague recollection of the surrounding facts); and State v. Wilson, 467 So.2d at 513 (the court found no need for venue change where only four of thirty-nine jurors were excused for having a fixed opinion).
Defendant claims the effect of the extensive pretrial publicity was apparent during the jury selection because of the responses of the prospective jurors. Four panels were questioned in this case. Defendant contends the first panel was not questioned at length about pretrial publicity; the second panel was questioned about pretrial publicity, and several jurors indicated they had outside knowledge of the case; the third panel was asked if any of the jurors had read or heard anything about the case; and the fourth panel was not specifically asked about exposure to pretrial publicity.
The transcript of the voir dire examination reflects that none of the prospective jurors on the first panel indicated they had heard or read anything about the offense after the court provided initial, limited information. When the court provided further information about the offense, only one prospective juror indicated he was familiar with the facts. Thus, there was no basis for extensive questioning of this panel about the effect of pretrial publicity.
After the indictment was read to the second panel of prospective jurors, several panel members indicated they had knowledge of the events at the store. One member was a manager of another branch of the same supermarket chain and knew one of the victims and several of the witnesses. Five other panel members revealed some knowledge about the events from newscasts or newspaper accounts. Each of these individuals was separately questioned; two persons indicated they had formed an opinion as to the defendant's guilt, although one of these persons later indicated she could not vote to convict because of the potential life sentence.
Seven members of the third panel of prospective jurors recalled hearing news accounts about the offense at the time it happened. None of those persons indicated they had extensive knowledge about the *917 case. One of the prospective panel members was a deputy who answered the initial dispatch to the scene of the robbery, but he was immediately excused. The remaining members were not questioned extensively about the effect of their knowledge on their consideration of the case.
The fourth panel consisted of only six persons. After the panel was provided general facts about the offense, none of the panel members indicated any knowledge about the offense; hence there was no need to question them about the effects of pretrial publicity.
In its written reasons for judgment denying the motion for change of venue, the trial court noted that several prospective members of the jury had knowledge of the facts of the offense, but many had no knowledge at all. However, the court noted that the panel members selected for the jury who had prior knowledge of the offense testified they would be able to put aside the information and give both sides a fair trial.
Defendant claims that in light of the inconsistent questioning of the potential jurors on this issue and the extent of the effect of the pretrial publicity in this case, it was impossible for him to receive a fair and impartial trial in East Baton Rouge Parish. We agree that the questioning was inconsistent, and we find the failure to question the members of panel three who indicated they had knowledge of the facts of the offenses from news accounts to be inadvisable. Nevertheless, the mere fact that persons had knowledge of the offenses is not sufficient to establish the need for a change of venue; the defendant must establish that it was impossible for him to receive a trial where he was originally charged. Defendant did not avail himself of the opportunity to question these jurors himself. The trial court very clearly explained the presumption of innocence and inquired if anyone on the panel would not be able to apply it, and none of the prospective jurors indicated any problem with the presumption of innocence. The court also specifically asked the panel members if any one of them had any belief that would prevent giving both sides a fair trial; none of the prospective jurors indicated that a personal belief or opinion would prevent the juror from giving both sides a fair trial. Finally, the court asked if there was any reason whatsoever why any panel member could not give both the defendant and the State a fair trial and decide the case solely upon the evidence presented in court in accordance with the law; at that time, one prospective juror noted that she had known the defendant's sister for a number of years, but further explained it would not impact her judgment in deciding the guilt or innocence of the accused. Thus, although it would have been appropriate for the prospective jurors who indicated some knowledge about the offense to be individually questioned further, the record reflects that the court did repeatedly inquire into prejudices or other causes why any jurors would not be able to decide the case on the evidence presented, and we are satisfied that challenges for cause would have been uncovered by the court's questioning.
Out of the entire voir dire, one prospective juror was challenged because he had knowledge about the case as a manager for the same supermarket chain and because he knew one of the victims and several of the witnesses. Only two prospective jurors revealed that they had made up their minds about the defendant's guilt, and one of those persons indicated she would not vote to convict because of the life sentence. Thus, as a gauge of the level of prejudice against defendant in the community, the number of jurors excused for the cause of having formed an opinion as to his guilt or innocence showed that the level of prejudice was minimal.
Moreover, defendant failed to establish that he met any of the criteria that would indicate a change of venue was warranted. There was no showing of the nature of the pretrial publicity or the particular degree *918 it had circulated in the community, although the responses of the panel members as a whole indicated that the pretrial publicity was not pervasive. Defendant made no showing of the government's connection to the publicity; however, we note that the prospective jurors' answers almost universally reflected that the information was gleaned from news accounts at the time of the offenses and not governmental sources. More than a year elapsed between the initial publicity and defendant's trial. While the offenses could be considered both severe and notorious, most panel members had little or no knowledge of the offenses. The jury panel was drawn from a large, primarily metropolitan area, and not a close community. There were no alleged or apparent outside influences or community interests that might have affected the potential jurors' attitudes toward defendant or other factors that might have influenced the veracity or candor of the prospective panel members on voir dire.
Accordingly, the trial court did not abuse its discretion in denying defendant's motion for change of venue. This assignment of error has no merit.

SUFFICIENCY OF THE EVIDENCE

(Assignment of Error No. 8)
By this assignment of error, defendant alleges that the evidence is insufficient to establish the elements of these offenses. Defendant claims the evidence supporting the verdicts of aggravated kidnapping and second degree murder is circumstantial and (even assuming the State established defendant abducted Jacqueline Purdue) the State presented no evidence defendant intended to force the victim to give up anything of value to secure her release. With regard to the convictions of armed robbery and felon in possession of a firearm, defendant claims the State failed to establish his identity as the perpetrator.
The standard for reviewing claims challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979) (emphasis in original). See also LSA-C.Cr.P. art. 821.
To prove second degree murder, LSA-R.S. 14:30.1(A), the State must show (1) the killing of a human being and (2) that defendant had the specific intent to kill or inflict great bodily harm.
Louisiana Revised Statutes 14:44 defines the crime of aggravated kidnapping as follows:
Aggravated kidnapping is the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.
Possession of a firearm by a convicted felon requires proof of: (1) the possession of a firearm; (2) a previous conviction of an enumerated felony; (3) absence of the 10-year period of limitation; and (4) general intent to commit the offense. LSA-R.S. 14:95.1; State v. Ball, 99-0428, p. 3 (La.11/30/99), 756 So.2d 275, 277.
Armed robbery is defined in LSA-R.S. 14:64 as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon."
*919 John Green, III, testified that he planned the robbery of the Winn-Dixie Supermarket with defendant and Jonathon Molden after noticing on a trip to a nearby Wal-Mart that the Winn-Dixie seemed to have a lot of money. On the night before the robbery, the three men played video games and discussed the robbery before going to sleep. Green awakened the others around 5:00 a.m. to rob the store. They took their guns and pillowcases from Green's apartment. Green had a .38 revolver, Molden had a .40 automatic, and defendant had a long, black revolver. Defendant was dressed all in black.
The conspirators took both Green's car (a champagne Cutlass) and his girlfriend's car (a burgundy Buick Regal) to the area. They left the Regal in the parking lot of a Motel 6 on Siegen Lane and drove to the Winn-Dixie in the Cutlass. Their intention was to use one car to rob the store and the second to get away. Green went inside the store to buy a soft drink and to verify that the robbery could proceed. Then the three men drove back to the motel and switched cars. Only Green, defendant, and Molden knew about the other car in the parking lot.
Molden did not want to go through with the robbery when they first arrived at the store. However, after Green drove around in the parking lot, Molden changed his mind. Green stayed in the car and watched for the police while Molden and defendant went inside the store with their guns out. After several minutes, Green blew the horn because he felt the robbery was taking too long. Molden came out of the store and talked to Green; Molden did not know where defendant was and was ready to leave him, but Green told him to go back in the store and find defendant. Molden went back inside the store, but was still unable to find defendant. As he came out to report to Green, the first police unit arrived. Green and Molden drove off, leaving defendant at the store. The police followed the car, and after a truck hit the car as it crossed Airline Highway, Molden and Green jumped out of the car and ran to the Audubon Ford lot nearby. Both men eventually were arrested there.
After Molden and Green were arrested, Green denied that a third person was involved; however, he later admitted this statement was a lie and testified at trial that it was a lie. Several hours after their arrest, Green's girlfriend arrived at the police station to retrieve her car; it was then the police learned there had been a second vehicle involved. The police took Green back to the motel parking lot. Defendant was standing beside Green's car. When the police asked if defendant was the third person involved in the robbery, Green again lied and said that he was not. He told the police the third person was "Cotton," choosing the name from a character in the movie Scream 2 because he believed defendant resembled the character by that name. Thereafter, an Iberville Parish deputy showed Green a photograph of the murder victim; Green decided to tell the truth after he learned that someone had died. Green claimed they never had intended for anyone to be hurt or killed.
Jonathon Molden also testified on behalf of the State. Molden agreed that the plan to rob the supermarket originated as Green's idea. Defendant was dressed all in black. Molden wore blue jeans under warm-up pants and a plaid jacket. Only the three conspirators knew about the second car in the motel parking lot.
After he and defendant went inside the store, Molden ordered everyone to get down on the floor. He went to a cashier and took all of the money from the register before robbing some of the store's customers. Molden began to get nervous because they had been in the store for a long time, and he went outside to talk Green into leaving. After Green refused, Molden went back into the store and whistled for defendant. Then Molden and Green left without defendant. As they were leaving, *920 Molden saw defendant come out of the store and turn to his left.
After his arrest, Molden also was asked about a third person involved in the robbery, but Molden did not identify anyone. Even after he saw defendant handcuffed in the Motel 6 parking lot, he told the police he did not think defendant was the correct person. However, Molden later admitted defendant was the third person involved. He specifically testified his initial statement denying that defendant was involved was a lie.
After all three men had been arrested, defendant asked Molden and Green to sign an affidavit stating he was not with them when they committed the robbery. Green testified:
He said it would be best for one or two of us to be on the street and while the other one locked (sic) up, the ones that's on the street could take care of business for the other one.
Molden initially refused to sign the affidavit, but he signed it after the attorney who presented it to him stated it was the only way "we" would be able to get out of the charge. Both Molden and Green specifically testified that the affidavit was not true.
Two of the customers who were robbed also testified on behalf of the State. Carl Brandt was confronted by a man in a plaid jacket, wearing a mask, who pointed a gun at him as soon as he walked into the store. Brandt gave the gunman approximately $30.00 from his wallet. He got down on the floor and stayed there for approximately ten minutes, until a store manager came out and told everyone they could get up. A floor buffer was running throughout the entire ordeal, and Brandt was unable to hear much of what transpired elsewhere in the store.
Carl D. Wright testified he went to the store with his wife, and she stayed in the car while he went inside. The car was parked in a no-parking area, and Wright noticed another car parked in the no-parking zone with a man sitting inside. As soon as he went inside, Wright realized the store was being robbed. He was accosted by a tall black man with a gun and a mask on his face. Because Wright had only a debit card, nothing actually was taken from him; but Wright saw the gunman rob Brandt. He recalled hearing a car horn blow. The gunman in the front of the store whistled, and another person came from the back of the store with a money bag.
Several Winn-Dixie employees also testified. Joseph Timpa saw two men in the store, a man in plaid who started taking money from a register and another man, dressed all in black, who walked past him to the back of the store. Timpa heard a horn blow and the gunman in plaid eventually went to the door just before a car took off.
Robert L. Breton was buffing the floors when someone touched him on the shoulder. He turned and saw a man who stuck a gun in his face and told him to lie down on the floor. The gunman went into the store office and stayed for four or five minutes. Breton could hear a car horn blow.
Ricky Jackson was the overnight cashier. He saw two men come into the store, one with a red plaid jacket and one with darker clothing. The man in plaid pointed a gun at him and forced him to empty the cash register. After he got the money, the man started asking for the manager and kicking Mr. Timpa.
Isadore Johnson was working in the produce department when he saw two gunmen come towards him. One of the robbers took approximately $15.00 from Johnson's wallet. One of the men was very tall, and from the visible skin around his mouth and eyes, Johnson noted that the man was light-skinned.
Ronnie W. Brown worked as an overnight stocker. He saw Isadore Johnson with a man dressed in all black; the tall man in black had a light complexion and *921 waved a gun as he came toward Brown. The gunman ordered him to the front of the store. Brown went to the front and saw a second gunman with a red plaid jacket near the night cashier, kicking Mr. Timpa in the side. The second gunman asked if he had to kill someone to get the manager to come to the front of the store. Brown gave the man money from his wallet, and he saw the man rob some of the customers. He heard the man whistle, and he heard a car horn blow. He looked around and saw the gunman dressed in black come out of the office carrying full bags in his hands and walking hastily. He identified defendant as being the same height.
Stephanie Wales and Anita Simmons saw the man dressed all in black with a gun in his hand. Both women testified the man was light complexioned; Wales testified that his complexion was light, like the defendant's, and he was very tall; Simmons testified the man appeared to be either light complexioned or a white male. Carolyn Pierce, another store employee, drove up to the store to go to work and heard a horn blowing. She saw a man sitting in a car in front of the store. When she looked around she saw someone walk quickly into the store, and she thought she saw the man was wearing a black mask, but could not believe what she saw. She watched the man through the door. When a customer pulled up and parked behind the car, she walked into the store behind the customer and saw people on the floor. She backed out of the store and along an outside wall to a rear door.
Christopher Raby, referred to as "Chef Ya-ya," worked in the deli area. He came out of the refrigerator and heard someone ordering the women who worked in the bakery department to go to the front of the store. He walked past a man holding a gun and went to the back of the store, where he told other employees the store was being robbed; he went into a freezer. Raby only mentioned one gunman in the store, but that man was tall and very light skinned.
Raby testified Jackie Purdue was scheduled to be the deli associate working with him that morning. Purdue was second in charge of the deli department and was known to be punctual and very consistent about being at work, usually arriving fifteen to thirty minutes before her shift began.
The robbery occurred around 5:45 a.m. At approximately 6:45 a.m., Raby checked the schedule at the behest of the deli manager and learned that Purdue was supposed to have been at work at 6:00 a.m. Raby immediately thought she must have come into the store while the robbery was taking place.
Ella LeBourgeois was the seafood manager of the supermarket. She heard Raby say that the store was being robbed, but she initially thought he was joking. When she realized that he was serious, she picked up the telephone and called 911. She handed the telephone to someone else, and that person actually reported the robbery.
Brett Wederstrandt was the manager on duty at the Winn-Dixie when the robbery occurred, and he was in the office when he realized something was going on. He heard someone hit the wall and tell him to open the "f-ing door." As he turned around, a man broke the window, stuck his hand holding a gun inside, and told Wederstrandt to open the door immediately. Wederstrandt opened the door and tried to open the safe as the gunman paced in the office. The gunman pushed Wederstrandt aside and demanded the combination to the safe. However, when he also was unable to open the safe, the gunman ordered Wederstrandt to try again while the man held a gun to Wederstrandt's head. Wederstrandt finally managed to get the safe door open, and he took money out of the safe and placed it in bags.
Winn-Dixie has a policy for employees' responses during armed robberies. Wederstrandt *922 followed the procedure, which calls for the employee to fully cooperate, but obtain a full description of the clothes, height, weight, and other identifying marks of the perpetrator. Wederstrandt testified the man wore a black mask, black shirt and pants, and he had on black and white tennis shoes. Wederstrandt identified the gun held to his forehead during the robbery as a black .45 revolver with a barrel approximately six inches long.
After the gunman left the office, the main store manager telephoned and told Wederstrandt to call 911 right away. When he placed the call, Wederstrandt was told the police already had been informed of the robbery. He went out into the store, turned off the buffer, and told everyone they could get up because the robbers were gone. The police were in the store immediately thereafter.
In May 1998 (five months after the robbery) Wederstrandt viewed a lineup of six men at the parish jail. He previously had provided the police with a list of the sentences he heard the gunman speak, and each of the six men read the sentences. When the man in position number 3 (defendant) read the sentences, Wederstrandt stepped away from the window because he recognized the voice, eyes and stubby mustache of the man who robbed him. Wederstrandt asked the police to have No. 3 step up to the window, where Wederstrandt looked him "eyeball to eyeball" and knew for certain he was the robber. Although Wederstrandt had no doubt that man was the robber, he viewed all six men because the assistant district attorney requested that he look at all of them. Wederstrandt testified he was "without a doubt" certain that No. 3 was the man.
Joylyn Wright drove to the store with her husband, Carl Wright, and waited in the car while he went inside. She saw a man walk past the registers, and she became nervous because he did not appear to be buying anything and she could not see anyone at the registers. She watched a white male walk into the store, and then she saw a man inside the store pull a gun on him. The gunman in the store came out and talked to the man in the car. When he went back into the store, she drove off a back way to get help. She stopped and blew her horn at a driver coming into the parking lot, hoping the driver had a car phone, or that she could at least alert the person about the robbery. When the driver slowed, she got a close look at the driver. She positively identified a photograph of the murder victim's car as the car that she saw and a photograph of the murder victim as the driver whom she tried to warn.
Mrs. Wright drove to a nearby gasoline station and asked a cashier to call the police because of the robbery at the Winn-Dixie. When she returned to the Winn-Dixie, the car that had been parked in front was gone and the police were there.
Hollis Purdue testified that he and Jacqueline Purdue had been married only one month before she was murdered. She left to go to work at approximately 5:55 a.m. on the day of the robberies. He received a telephone call around 8:00 or 9:00 a.m., telling him that she had never arrived. Accompanied by Jacqueline Purdue's mother, he drove her regular route from their home to the store, but they did not find her. Purdue identified a photograph of her car from a special license plate.
Darrell Morris, defendant's cousin, testified defendant asked him for a ride to the Motel 6 parking lot so that he could get back a car radio that he had loaned to someone. He saw defendant get into a car and drive off, but the police immediately stopped the car, as well as the vehicle he (Darrell Morris) was driving. He recognized the car defendant was driving because he had seen John Green drive it.
Deputy Sheriff Dana Boatner responded to a call about an armed robbery in progress at the Siegen Lane Winn-Dixie. As he arrived, he saw a car leaving from the other end of the parking lot. The driver did not stop, even after Deputy Boatner *923 turned the signal lights on. The driver ran a red light at Airline Highway and the car was struck by another vehicle. Two black males jumped out of the car and ran to the Audubon Ford lot. The first suspect was captured five to ten minutes later, and the second man was captured thirty to forty-five minutes later. A .40 Tauras and a .38 handgun were recovered from the car.
Detective Mike Jackson was one of the officers who participated in the initial stages of the investigation at the Winn-Dixie. After statements had been taken from the employees and witnesses, and after Molden and Green were under arrest, the police determined that a third person must have been involved in the robbery and that a large revolver and a substantial amount of money were still missing. The police also determined that Jacqueline Purdue had not arrived at work that day, and they began to investigate to determine why she had not.
Detective Jackson interviewed Molden and Green, and he was told that a third person nicknamed "Cotton" had been with them. He also learned that a second getaway vehicle was parked at the Motel 6 down the street from the robbery. At the same time, Iberville Parish sheriff's detectives notified the Baton Rouge officers that the body of Jacqueline Purdue had been found. Detective Jackson left the police station and went to the Motel 6, calling for all available units to go to that location and look for a champagne Cutlass with a temporary license tag in the back window. Deputy Brett Kirby was the first officer on the scene, and he observed a champagne Cutlass with a temporary license tag in the window pull out of the parking lot, being driven by a light-skinned male. It was followed by a white Chevrolet. He immediately alerted other police officers and pulled out behind the cars.
Driving an unmarked police car, Detective Jackson arrived at the location as the other vehicles entered Siegen Lane. He pulled up beside the Cutlass to determine how many people were inside. The car was occupied only by the driver, but Jackson immediately recognized him as one of the robbers from the description Wederstrandt provided during his interview. The officers effected a traffic stop of both vehicles, and defendant was arrested and searched. The arrest was made at 11:44 a.m., not quite six hours after the robbery was first reported.
The victim's car was found in Baton Rouge by Karl Jackson, who, coincidently, was himself incarcerated in the East Baton Rouge Parish jail for armed robbery at the time of defendant's trial. Jackson did not know defendant, Green, or Molden. He found the car while he was riding a bicycle across a path at the dead-end of a street. Jackson did not know the name of the street, but he identified the location on a photograph taken of the area. The keys were in the car, but it was undamaged except for the glass broken out of the passenger's window. Jackson took the car for a joy-ride after removing several items he found inside it, which included an anti-theft device, some work aprons and a hair pick. He placed the items behind an abandoned house.
Jackson found the car between 9:00 and 10:00 a.m. on the day of the robbery. He turned the car over to a "partner" later that afternoon. Jackson identified a photograph showing the car after it had been burned, but he testified he was not present when the car was burned and did not know why it was burned. He later met with Detective Mark Hastings and agreed to show him where he found the car and where he placed the items he removed from it. Hastings identified the area as the corner of Charles and Conrad Streets. The path Karl Jackson used was on a cross-street at Eleanor and Charles Streets, a driving distance of approximately half a mile from the house where defendant's mother lives.
Deputy Scott Courtade of the Iberville Parish sheriff's office was dispatched to an *924 oilfield road off Hwy. 74 in St. Gabriel where the body of an unidentified black female had been found face down by the side of the road. Courtade checked and determined that the victim had no pulse. There was glass on the victim's back and tire marks beside her body.
Detective Kevin Ambeau of the Iberville Parish sheriff's office also participated in the investigation. When the body of the victim was turned over, it was discovered that she was wearing a Winn-Dixie uniform and that she had been shot. Ambeau went to the nearest Winn-Dixie location, and he learned about the incident at the Siegen Lane store. Ambeau and another detective took a photograph of the victim to the manager of the Siegen Lane store, and the manager identified the victim from the photograph.
The evidence that defendant committed the armed robberies was overwhelming. In addition to the testimony of their robbery plans by Green and Molden, Brett Wederstrandt's testimony clearly established that he had the reason and opportunity to commit the robber's features to memory and that he did; his identification of defendant as the man who forced him at gunpoint to give the robbery money from the safe was certain. The testimony of the victim is sufficient to establish the elements of the offense. State v. Glover, 98-2632, p. 9 (La.App. 1 Cir. 9/24/99), 754 So.2d 1044, 1048, writ denied, 99-3200 (4/7/00), 759 So.2d 94. Moreover, although none of the other employees had as much contact with defendant as Wederstrandt, other identifying features such as his complexion tone and height were corroborated by a number of persons.
Thus, we find no merit in defendant's claim the evidence supporting the robbery convictions was insufficient.
Relative to the felon in possession of a firearm charge, his identity as a felon was established through: the testimony of the prosecutor representing the State when defendant pled guilty to first degree robbery in 1994, who clearly identified defendant as the person who entered the plea; and through fingerprint evidence comparing prints taken in court with fingerprints from state police records of the prior conviction. Accordingly, we find the State also established beyond a reasonable doubt that defendant had a prior conviction; therefore, because he was armed during the robbery, the State sufficiently established that defendant was a felon in possession of a firearm.
The evidence supporting the convictions for aggravated kidnapping and second degree murder was largely circumstantial, but no less sufficient. A number of witnesses testified there were two gunmen inside the store and another person waited in a car in front of the store. One witness heard a car drive off just after the man in plaid left the store. Green and Molden's testimony that they were concerned about how long defendant was taking with the robbery and that they conferred about what to do was corroborated by a witness who saw Molden exit the store, talk to Green, and then return to the store. Molden and Green clearly testified they left defendant at the store; although the police already were converging on the store as Molden and Green left, the investigation which began immediately turned up no trace of defendant on the premises. The murder victim left home to go to the store, and she actually was seen in the parking lot of the store as the robbery was in progress, after Molden already had become concerned about the length of the robbery and had consulted Green about it. Her body was found only an hour later. She had been shot twice, once at a range so close that the gun, a .45 revolver with a six inch or longer barrel, must have been touching or almost touching her raincoat when the gun was fired. Her car, with a broken window, was found by Karl Jackson on the same morning as the robbery. The date on which he found the car was established through the testimony of a witness who saw the victim in the vehicle as *925 the robbery was taking place. Karl Jackson found the car a short walk from the home of defendant's mother two to three hours after the robbery. Yet the car, with an easily identifiable "Hollis and Jackie" license plate, was found burned in Baton Rouge about 1:00 a.m. the day after the murder.
Defendant claims that the only inferences that could be drawn from this evidence are that he may have needed transportation, that the victim entered the parking lot at about the same time, and that her car was found near his mother's house. Defendant further alleges there is no physical evidence connecting him to the crimes and that the State presented absolutely no evidence that he intended to force the victim to give up anything of value to secure her release. Thus he apparently argues either that the victim voluntarily gave him a ride or that he could not be guilty of kidnapping because he intended to murder her from the outset.
When used properly, circumstantial evidence is competent evidence, although it is subject to rigorous statutory and jurisprudential standards. In cases where the conviction is based on circumstantial evidence, LSA-R.S. 15:438 provides, such evidence must exclude every reasonable hypothesis of innocence, but it does not require a stricter standard of review than the more general rational juror's reasonable doubt formula. State v. Casey, 99-0023, 2000 WL 101212, at *3, p. 14 (La.1/26/00), ___ So.2d ___, ___, cert. denied, ___ U.S. ___, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). In State v. Juluke, 98-0341, p. 5 (La.1/8/99), 725 So.2d 1291, 1293, the Louisiana Supreme Court further discussed the circumstantial evidence standard as follows:
In a case involving circumstantial evidence in which the jury has reasonably rejected the defense offered at trial, the reviewing court therefore "does not determine whether another possible hypothesis has been suggested by defendant which could explain the events in an exculpatory fashion." State v. Captville, 448 So.2d 676, 680 (La.1984) (emphasis in original). Instead, the reviewing court must "evaluate[ ] the evidence in the light most favorable to the prosecution and determine[] whether the alternative hypothesis is sufficiently reasonable that a rational juror could not `have found proof of guilt beyond a reasonable doubt.'" Id. (quoting Jackson [v. Virginia], 443 U.S. [307] at 324, 99 S.Ct. [2781] at 2792, 61 L.Ed.2d 560).
When the State relies upon the "forcible seizing" provision of the aggravated kidnapping statute, the State is required to prove the following essential elements: 1.) the forcible seizing and; 2.) the carrying of any person from one place to another (the asportation element); 3.) with the intent to force the victim, or some other person, to give up anything of apparent present or prospective value (the extortion element); 4.) in order to secure the release of that person. State v. Arnold, 548 So.2d 920, 923 (La.1989); State v. Bilbo, 97-2189, p. 11 (La.App. 1 Cir. 9/25/98), 719 So.2d 1134, 1140, writ denied, 98-2722 (2/5/99), 737 So.2d 747. The phrase "anything of apparent present or prospective value" includes the situation where an offender forces a victim to transport the offender to a particular location. State v. Roblow, 623 So.2d 51, 57-58 (La.App. 1 Cir.1993). Louisiana Revised Statutes 14:44 provides that an accused is guilty of kidnapping if he forcibly seizes and carries a person from one place to another or if he entices or persuades a person to go from one place to another, with the requisite intent.
Because the victim is dead, the State could not establish that defendant explicitly communicated to her that she would be released if she complied with his demands. Nevertheless, a reasonable person in the victim's place could believe that, when confronted by a man desperate to get away and armed with a very large gun, he or she would not be safely released *926 unless she complied with his demands. Under these circumstances, requiring additional evidence that defendant expressly announced to the victim she would not be released unless she complied with his demands is overly technical and unnecessary. See, e.g., State v. Arnold, 548 So.2d at 924. Moreover, it is reasonable to assume that the victim was murdered by the person who kidnapped her. The jurors could rationally infer that by shooting the victim point-blank in the chest with a large caliber weapon defendant acted with the specific intent to kill her. See State v. Williams, 93-2707, p. 4 (La.3/11/94), 633 So.2d 147, 149.
Accordingly, we find that the totality of the evidence, direct and circumstantial, is sufficient to establish defendant's guilt of the charges of armed robbery, felon in possession of a firearm, second-degree murder and aggravated kidnapping. This assignment of error has no merit.

DENIAL OF MOTION FOR NEW TRIAL

(Assignment of Error No. 9)
By this assignment of error, defendant contends the trial court erred in denying his motion for new trial. Two motions for new trial were filed. Appellate counsel specifically withdrew the first motion.
Defendant's second motion for new trial was based on a claim that the joinder of the charge of felon in possession of a firearm was improper and on a second claim that the State failed to disclose material evidence. However, having found no merit in defendant's claim the trial court erred in refusing to sever the charge of felon in possession of a firearm, we likewise find no merit in defendant's claim the court should have granted him a new trial on the same ground.
Defendant also claims the State failed to disclose the nature of its relationship with Green and Molden and any arrangements that may have been made with them for their testimony, and, therefore, a new trial should be granted due to the suppression of material evidence favorable to the accused. Defendant notes that the extensive delay between their pleas and the imposition of sentences for those convictions is unusual and created the implication they would be rewarded for their testimony. After Green and Molden entered their guilty pleas in October 1998, the court initially indicated that it would impose sentences in December. However, the State notified the court that defendant's trial had been delayed until January and asked if the sentences could be imposed the following week; the court agreed. Defendant claims this request is evidence that an agreement existed to reward them for their testimony.
Louisiana Code Criminal Procedure article 851 provides grounds for a motion for new trial, as follows:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
(1) The verdict is contrary to the law and the evidence;
(2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;
(4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment; or

*927 (5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
Defendant's motion for new trial contains only a generic citation to Article 851; it does not indicate which of these provisions is applicable, and thus presents nothing for us to review. We note especially that defendant does not specifically direct this court to any ruling on a pretrial motion, claim there is new and material evidence, nor claim that he has discovered, since the trial, prejudicial error that could not have been discovered before trial. Defendant possibly contends that a new trial should be granted because the ends of justice would be served thereby. However, when the defendant's motion for new trial is based on the ground that the ends of justice would be served, denial of the motion is not subject to appellate review. See State v. Lynch, 94-0543, pp. 19-20 (La.App. 1 Cir. 5/5/95), 655 So.2d 470, 481, writ denied, 95-1441 (11/13/95), 662 So.2d 466.
Assuming that defendant's motion is based on a claim the convictions were contrary to the law and the evidence and that such a claim is properly before us, we, nevertheless, find no merit in defendant's claim that the trial court erred in denying his motion for new trial. Initially, we note that only the weight of the evidence can be reviewed by the trial judge in a motion for new trial under LSA-C.Cr.P. art. 851(1); the trial judge can grant a new trial only if dissatisfied with the weight of the evidence, reviewed as by a thirteenth juror and not under the standard of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). State v. Korman, 439 So.2d 1099, 1101 (La.App. 1 Cir.1983) The jury verdict was unanimous; the trial court could have concluded that the weight of the evidence was sufficient. In any event, assuming defendant's arguments are properly before this court, we find defendant's arguments have no merit.
Green and Molden pled guilty to three counts of armed robbery eight months before defendant's trial, but had not been sentenced at the time of defendant's trial. They were sentenced approximately one month after the trial. Green, the driver of the getaway vehicle, was sentenced to three concurrent terms of nine years at hard labor, without benefit of probation, parole, or suspension of sentence. Molden was sentenced to three concurrent terms of ten years at hard labor, without benefit of probation, parole, or suspension of sentence. Claiming that "it defies commonsense to conclude otherwise," defendant rejects the State's repeated assurance and testimony that the State made no agreement with Green and Molden and urges he is entitled to a new trial because the State failed to disclose its relationship with them.
Defendant first filed what he termed a "motion to reveal the deals" in May 1998, and at that time the State asserted in writing that there was no agreement. Defendant also filed a motion for the disclosure of impeaching evidence, asking the State to reveal any and all consideration or promises of consideration given to or made on behalf of government witnesses, and the State again asserted in writing that there was no agreement. Defendant filed a second "motion to reveal the deals" in February 1999. He filed a "motion to produce" seeking the same information, and the State again responded that there was no agreement. Defendant filed a Brady motion, asking the State to produce any information that might affect the credibility of any witness or potential witness, including bias or interest of the witness, and the State again responded that it had no information.
During the voir dire, defense counsel asked to review the pre-sentence investigation report of the co-defendants, and in ruling on this request the trial court noted that it had reviewed the pre-sentence investigation *928 and found no exculpatory evidence. The trial court denied a motion for mistrial based on defendant's claim that a deal had been offered to the co-defendants and a motion to suppress the testimony of the co-defendants on the grounds their testimony was inadmissible under the public bribery statute.
During defendant's trial, Green testified under oath that when he pled guilty there was no agreement whatsoever between him and the District Attorney. Molden testified that when he pled guilty he had no agreement with the District Attorney's office or any individual prosecutor. In the proceeding wherein they pled guilty, counsel for both men indicated their clients had no plea agreement. The court emphasized before accepting the pleas that, in court vernacular, they were pleading "blind," which meant "that no one knows other than myself what your sentence would be," and that the court could impose a sentence anywhere from five to ninety-nine years on each count.
In argument on defendant's motion for new trial, defense counsel contended that the State's response that there were no deals with Green and Molden was inaccurate because they could have been charged as principals with kidnapping and murder, but were not, and that the State's agreement to stay out of the sentencing was itself a valuable "commodity." The State responded that the decision not to indict Green and Molden as principals to the murder charge was made by the grand jury and that declining to participate in the sentencing did not constitute a deal. The State further noted that counsel for Molden and Green actually had hoped for lesser sentences.
The court noted that it had been concerned about any agreement to testify and thus made sure the assistant district attorney had no input into the sentencing of Green and Molden; the court also had informed the State that it would grant a new trial if it found the State had a covert or benign agreement with them. The court noted the issue of sentencing delay could have been brought to the jury's attention when counsel attempted, through cross-examination of Molden and Green, to bring out any bias on their part; the court denied the motion for new trial.
Notwithstanding the State's responses, testimony, and other evidence to the contrary, defendant now argues that the State actually must have had a secret agreement with Molden and Green or that the State's refusal to enter into an agreement with Molden and Green constituted an agreement that should have been made known to the jury. Defendant argues that "the state's case against [defendant] depended almost entirely upon the testimony of Green and Molden; they were the only two people who could connect [him] to these crimes." The State contends that Molden's and Green's sentencings were delayed until after defendant's trial on motion of their attorneys and not through action by the State; that any benefit received by Molden and Green was not attributable to the State because the State was entirely removed from the sentencing proceeding. Although the transcript of the Boykin hearing contains one reference to delaying the imposition of sentence until after defendant's trial, on numerous occasions the State emphasized that it had made no agreement with them. The court noted during the sentencing of Molden and Green that their attorneys had argued for leniency, based on their cooperation with the State, and their arguments convinced the court to reduce the sentences it initially had planned.
Defendant's claim that a secret agreement existed was contradicted by the record. Defendant was aware before trial that Molden and Green had not been sentenced and that the State had no agreement with them. Counsel did not question them before the jury about any belief their testimony may have had on the court's determination of the sentence. However, it is clear that any hope their testimony might favorably impress the *929 sentencing court was merely a hope and not an expectation of a sure reward.
Moreover, their testimony was not the only evidence linking defendant to the crimes. Although many of the victims and Winn-Dixie employees could not identify defendant, Brett Wederstrandt's testimony that defendant was the person who held a gun to his head and forced him to open and empty the store's safe was unequivocal. Accordingly, we find no merit in defendant's claim that there is a reasonable likelihood the verdict would have been different if the jury had been informed that the State would have no participation in the trial court's determination of Green's and Molden's sentences. We find no error in the denial of defendant's motion for new trial.

EXCESSIVE SENTENCES

(Assignments of Error 10 and 11)
In these assignments of error, defendant contends the court imposed excessive sentences and failed to comply with the sentencing criteria of LSA-C.Cr.P. art. 894.1. Defendant filed a motion to reconsider the sentences claiming only that they were excessive, and the trial court denied the motion. Defendant originally was sentenced on September 8, 1999, and the court clarified the sentences on September 13, 1999.
At the beginning of the resentencing hearing, the trial court noted its intention was to make sure the sentences of the court were accurately reflected for appeal purposes. Thus, the court apparently had no intention to modify the sentences. The transcripts of the proceedings indicate that the court initially did not state that the defendant was to be given credit for time served, but at resentencing a provision for credit for time served to the extent allowed was added. The transcripts also show that the sentences for counts four and five initially were not imposed at hard labor, but at resentencing the court specified that they were to be served at hard labor. In the original sentence, the trial court specified that the sentences for convictions on counts six and seven would be served at hard labor, but that provision was omitted during resentencing. However, we note that the court did order the sentences to be served in the custody of the Department of Corrections, and only individuals actually sentenced to death or confinement at hard labor can be committed to the custody of the Department. LSA-R.S. 15:824(C).
As the result of the resentencing proceeding, the record now reflects that all of the sentences are to be served at hard labor, without benefit of probation, parole, or suspension of sentence, and with credit for time served to the extent credit is allowed. The sentences of seventy-five years or less are to be served concurrently with each other and consecutively to the two concurrent life sentences. Although it is apparent from the court's actions that it intended to vacate the original sentences to the extent, if any, that they were contradicted by resentencing, out of an abundance of caution we now vacate the first sentences. See State v. Thomas, 95-2348, pp. 6-7 (La.App. 1 Cir. 12/20/96), 686 So.2d 145, 149, writ denied, 97-0192 (3/14/97), 690 So.2d 36.
In light of the allegations of defendant's motion to reconsider sentence, this court is limited to a review of the bare claim of unconstitutional excessiveness. State v. Mims, 619 So.2d 1059, 1060 (La. 1993). Defendant does not specifically claim the ten-year sentence for the firearm charge or the seventy-five year sentences for the armed robbery convictions are excessive, and we note that the life sentences for the convictions of aggravated kidnapping and second-degree murder are statutorily mandated. However, defendant claims the life sentences are excessive because the court ordered them to be served consecutively to the sentences for armed robbery and felon in possession of a firearm. Defendant further claims that the court failed to provide any reasons for the *930 imposition of consecutive sentences, other than the notation during the resentencing proceeding that the court believed consecutive sentences were justified because the kidnapping and murder offenses were committed after the other offenses were complete. Defendant further claims that the sentences are excessive because the evidence is insufficient to prove that he actually committed any crimes.
Defendant's claim that the sentences are excessive because the evidence failed to establish that he committed any crimes has no merit. Moreover, the trial court's explanation that it believed consecutive sentences were appropriate because defendant kidnapped and murdered Ms. Purdue after having completed the robberies is sufficient justification for the imposition of consecutive sentences under these circumstances. In any event, even if this court were to find the trial court's reasons insufficient, the record amply supports the consecutive sentences imposed in these cases. See State v. Johnson, 99-0385, p. 7 (La.App. 1 Cir. 11/5/99), 745 So.2d 217, 221. These assignments of error have no merit.
CONVICTIONS AND SENTENCES AFFIRMED.
NOTES
[1] Judge William F. Kline, Jr., retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The initial indictment charged defendant with four counts of armed robbery and possession of a firearm by a convicted felon. A superceding indictment was filed almost one year later, adding the aggravated kidnapping and second-degree murder charges. Defendant was not rearraigned. The failure to arraign the defendant, or the fact that he did not plead, is waived if the defendant proceeds to trial without objecting thereto, and it shall be considered as if he had pleaded not guilty. LSA-C.Cr.P. art. 555. See also State v. Cousin, 96-2035, p. 2 n. 2 (La.App. 1 Cir. 9/23/97), 700 So.2d 1016, 1017 n. 2, writ denied 97-2809 (3/13/98), 712 So.2d 875.
[3] See, e.g., State v. Crosby, 98-0372, p. 1 n. 1 (La.App. 4 Cir. 12/2/99), 748 So.2d 502, 503 n. 1, writ denied, 99-3555 (1/28/00), 753 So.2d 833 (charges severed by trial court); State v. Johnson, 97-0605, p. 1 (La.App. 4 Cir. 4/22/98), 713 So.2d 579, 580 (charges severed by trial court); State v. Boyd, 94-641, p. 1 (La.App. 5 Cir. 12/28/94), 649 So.2d 80, 81 (charges severed by trial court pursuant to a defense motion in which the State concurred). See also State v. Young, 96-0195, p. 2 (La.10/15/96), 680 So.2d 1171, 1172 (bench trial of two counts of possession of a firearm by a convicted felon and one separately charged count of aggravated battery); State v. Brooks, 99-478, p. 1 (La.App. 3 Cir. 12/8/99), 756 So.2d 336, 337-338 (jury trial for possession with the intent to distribute cocaine, possession of a firearm by a convicted felon, and possession of a firearm while in possession of marijuana); State v. Johnson, 98-604, 98-605, pp. 2-3 (La.App. 5 Cir. 1/26/99), 728 So.2d 901, 904, writ denied, 99-0624 (6/25/99), 745 So.2d 1187 (bench trial of misdemeanor possession of marijuana and simultaneous jury trial on possession of firearm by convicted felon.)