STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2020 KA 0225

STATE OF LOUISIANA

VERSUS

JOSEPH VALCHEZ LAUE

Judgment Rendered: DEC 3 0 2020

* * * * * *

On Appeal from the Twenty-Second Judicial District Court
In and for the Parish of St. Tammany
State of Louisiana
No. 581152

Honorable Martin E. Coady, Judge Presiding

* * * * * *

Warren L. Montgomery                  Counsel for Appellee
District Attorney                     State of Louisiana
Matthew Caplan
Assistant District Attorney
Covington, Louisiana


Cynthia Meyer                         Counsel for Defendant/Appellant
Robert C. Stern                       Joseph Valchez Laue
New Orleans, Louisiana


* * * * * *

BEFORE: GUIDRY, McCLENDON AND LANIER, JJ.

**McCLENDON, J.**

The State of Louisiana, by grand jury indictment, charged Joseph V. Laue with second degree murder, in violation of LSA-R.S. 14:30.1 (count one); distribution of a Schedule I controlled dangerous substance ("CDS") (heroin), in violation of LSA-R.S. 40:966(A)(1) (count two); possession with intent to distribute a Schedule I CDS (heroin), in violation of LSA-R.S. 40:966(A)(1) (count three); and possession with intent to distribute a Schedule III CDS (buprenorphine), in violation of LSA-R.S. 40:968(A)(1) (count four). Defendant pled not guilty on all counts.

Defendant filed a motion to sever the second degree murder charge on count one from the drug offenses on counts two, three, and four. The trial court denied defendant's motion to sever.

After a trial by jury, defendant was found guilty as charged on all counts.[1] Defendant filed motions for post-verdict judgment of acquittal and for new trial. The trial court denied both motions. The trial court sentenced the defendant as follows: on count one, to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence; on counts two and three, to twenty-five years imprisonment at hard labor on each count, with ten years to be served without the benefit of probation, parole, or suspension of sentence on each count; and on count four, to two years imprisonment at hard labor.[2] The trial court ordered that the sentences be served concurrently.

The State filed a habitual offender bill of information, and the defendant stipulated to the allegations therein. The trial court adjudicated the defendant a third-felony habitual offender on counts two, three, and four. The trial court vacated the original sentences imposed on counts two, three, and four and resentenced the defendant as follows: on counts two and three, to thirty-five years imprisonment at hard labor without the benefit of probation or suspension of sentence on each count;

---

[1] As later discussed herein, the guilty verdicts on counts one, two, and three were unanimous, and eleven of the twelve jurors found the defendant guilty as charged on count four.

[2] The minutes indicate that the sentences on counts two, three, and four were imposed without the benefit of probation, parole, or suspension of sentence. However, the sentencing transcript reveals that the trial court restricted benefits for ten years as to counts two and three and did not impose any restriction of benefits on count four. It is well settled that in the event of a discrepancy between the minutes and the transcript, the transcript prevails. See **State v. Lynch**, 441 So.2d 732, 734 (La. 1983).

2

and on count four, to twenty years imprisonment at hard labor without the benefit of probation or suspension of sentence. The trial court ordered that all four sentences be served concurrently.

The defendant now appeals, assigning as error the sufficiency of the evidence on count one, the denial of his motion to sever, and the constitutionality of the sentence imposed on count one.[3] For the following reasons, we affirm the conviction and sentence on count one; we also affirm the convictions, habitual offender adjudication, and sentences on counts two and three; but we vacate the conviction, habitual offender adjudication, and sentence on count four.

## STATEMENT OF FACTS

On August 25, 2015, at approximately 5:06 p.m., the Slidell Fire Department, Acadian Ambulance, and officers of the Slidell Police Department (SPD) were dispatched to a residence located at 429 Codifer Street in Slidell in response to a 911 report of an unresponsive male believed to have overdosed on heroin. The first responders located Albert Marant (the victim) in one of the bathrooms. The victim was sitting on a toilet with his pants around his ankles. The first responders observed that the victim's color was gray and they were unable to detect a pulse. The victim's mother Newanna Bonnie Marant ("Ms. Bonnie"), his girlfriend Alexandra Hendricks ("Ali"), and his sister Amanda Marant were present and questioned by the police, and the scene was secured.

Jean Kaufman, a SPD crime scene technician and evidence custodian at the time of the offense, arrived on the scene at approximately 5:30 p.m. Kaufman processed and photographed the scene. Witnesses described the area in which the victim was located as an add-on bedroom or enclosed carport/garage that included a combined bathroom and washer and dryer area. The first responders did not identify visible signs of a struggle at the scene, and the victim's body had no signs of trauma. However, the victim had a scar and small lesions in the crook of his arm. A substance, 0.71 grams of suspected heroin, was located on a green card on top of the clothes dryer, along with a

---

[3] As further detailed herein, the defendant raises six assignments of error on the issues noted above.

3

spoon and a cell phone. A syringe that contained 3.10 grams of suspected heroin was located on the bathroom floor.[4]

According to Ms. Bonnie, Amanda, and Ali, the victim was struggling with a heroin addiction at the time of his death. At the scene, Ali informed the police that the victim had purchased heroin from a dealer earlier that day. Initially, Ali only identified the dealer as Joe. Ali later provided additional information regarding the dealer, including the area in which he resided and a physical description, and identified the defendant as the dealer in a photographic lineup.

Based on the information provided by Ali, Sergeant Dennis Bush and Detective Charles Esque of the SPD Narcotics Division began conducting surveillance within the vicinity of the defendant's Slidell residence. The defendant's residence was identified as the last house at the end of Hickory Street, a dead-end street located off of Highway 190, behind the Antebellum House. On two separate dates, September 8, 2015 and November 5, 2015, the officers observed hand-to-hand exchanges consisting of what they believed to be narcotic transactions. During the first incident, the officers followed the defendant to the outskirts of his neighborhood. The officers observed a hand-to-hand exchange between the defendant and the occupants of a vehicle, which they believed to be a narcotics transaction based on their experience.[5]

The second incident in November resulted in the defendant's arrest. Sergeant Bush and Detective Esque followed the defendant from his home to a location several blocks away. The officers observed the defendant interact with a second individual. The officers approached defendant and the second individual in their vehicle, and announced their presence as they exited their vehicle. The defendant tossed a small

---

[4] Brittany Graham, a forensic scientist of the St. Tammany Parish Sheriff's Office Crime Laboratory and expert in narcotics analysis, performed chemical testing in this case. She confirmed the presence of heroin after testing the substance recovered from the top of the dryer and the syringe.

[5] The officers pursued the vehicle and followed it to a Walgreens parking lot, where they observed an individual exit his vehicle and engage in a hand-to-hand exchange with the occupants of the pursued vehicle. The officers arrested the occupants of the vehicle, identified as Damien Hughes, Amber Higginbotham, and the third individual, Paul Fagan. Prior to being apprehended, Fagan discarded a substance. Sergeant Bush seized the substance, which was later confirmed to be heroin. Hughes and Higginbotham testified at trial and admitted to purchasing heroin from the defendant that day and selling a portion of it to Fagan.

object onto the ground (a piece of silver foil containing suspected heroin).[6] Following his arrest, the defendant was informed of his **Miranda**[7] rights and executed a waiver of rights form. During a post-arrest interview, conducted by SPD Sergeant Richard Walden, the defendant admitted to distributing narcotics.

## ASSIGNMENTS OF ERROR NUMBERS ONE, TWO, AND THREE

In assignment of error number one, the defendant argues that the conviction on count one, second-degree murder, should be reversed as the evidence was constitutionally insufficient to support the conviction. Defendant argues that the State and the jury conflated the LSA-R.S. 14:30.1(A)(3) requirement that a scheduled CDS be a direct cause of death with the mere sale of a CDS to a person who thereafter dies of an overdose with no evidence that the drug purchased from the accused induced the death in whole or in part. Defendant contends that while Louisiana law does not require that a defendant's sale of a CDS be the sole cause of death, it does require that a defendant's sale of a CDS be *a* cause of death. In assignment of error number two, the defendant similarly argues that the conviction on count one should be reversed as the evidence against him failed to exclude every reasonable hypothesis of innocence. He specifically argues that if the jury could not reasonably reject the hypothesis that the victim purchased heroin from multiple sources and did not consume any from the defendant on August 25, 2015, an essential element of second-degree murder was unproven. In assignment of error number three, the defendant argues that the trial court erred in denying his motion for post-verdict judgment of acquittal. The defendant presents the following related claims in support of his argument that the jury could not have reasonably rejected his hypothesis of innocence.

Initially, the defendant claims that due to the victim's heroin addiction and relationships with other drug dealers, the evidence presented the reasonable hypothesis that the victim's purchase and consumption of heroin was from a source other than the

---

[6] The substance tested positive as containing heroin. Just prior to tossing the heroin, the defendant's hand was extended toward another subject, Paul Bethe, as the officers approached. The defendant was arrested for possession with intent to distribute heroin, and Bethe was arrested for attempted possession of heroin. Sergeant Bush further testified at trial that three films of suspected suboxone, later determined to contain buprenorphine, and a piece of unused silver foil were recovered from the defendant's pants pocket during a pat-down search.

[7] **Miranda v. Arizona**, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

defendant. Secondly, the defendant similarly claims that there was no direct evidence that the heroin that caused or contributed to the victim's death was purchased on the day in question or from whom. He notes that no one was with the victim when he bought the heroin and that the victim did not afterwards identify the seller(s) to anyone else. While the defendant concedes that he had contact with the victim on the date in question, he emphasizes that another dealer, Matt Eagle, was the last person who spoke to the victim. Thirdly, the defendant claims that there was no direct evidence of the amount of heroin the victim bought on the day in question. The defendant claims that the amount of heroin that remained at the victim's house, 0.71 grams, exceeded the amount that the victim could have purchased from the defendant. The defendant notes that the amount was twice the amount he "allegedly sold [or intended to sell]" under counts two, three, and four of this case. Fourthly, the defendant reiterates his claim that the investigation did not tie him to the heroin used by victim on August 25, 2015. Finally, the defendant concludes that there was no direct evidence that his actions constituted a direct cause of the victim's death. He claims that there was no evidence that the heroin he sold to the victim on August 24, 2015, remained in the victim's system on August 25, 2015 *and* contributed to his death. The defendant argues that to hold otherwise would impose a form of "market share criminal liability[.]"

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. In reviewing claims challenging the sufficiency of the evidence, viewing the evidence in the light most favorable to the prosecution, an appellate court must determine whether any rational trier of fact could have found the essential elements of the crime and the defendant's identity as the perpetrator of that crime beyond a reasonable doubt. **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also LSA-C.Cr.P. art. 821(B); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660; **State v. Cockerham**, 2017-0535 (La.App. 1 Cir. 9/21/17), 231 So.3d 698, 703, writ denied, 2017-1802 (La. 6/15/18), 245 So.3d 1035. The **Jackson** standard of review, incorporated in LSA-C.Cr.P. art. 821, is an objective standard for testing the

6

overall evidence, both direct and circumstantial, for reasonable doubt. **State v. Legaux**, 2019-0075 (La.App. 1 Cir. 9/27/19), 288 So.3d 791, 794.[8]

When analyzing circumstantial evidence, LSA-R.S. 15:438 provides that the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. **State v. Patorno**, 2001-2585 (La.App. 1 Cir. 6/21/02), 822 So.2d 141, 144. When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. **State v. Dyson**, 2016-1571 (La.App. 1 Cir. 6/2/17), 222 So.3d 220, 228, writ denied, 2017-1399 (La. 6/15/18), 257 So.3d 685. Unless there is internal contradiction or irreconcilable conflict with the physical evidence, the testimony of a single witness, if believed by the fact finder, is sufficient to support a factual conclusion. **State v. Marshall**, 2004-3139 (La. 11/29/06), 943 So.2d 362, 369, cert. denied, 552 U.S. 905, 128 S.Ct. 239, 169 L.Ed.2d 179 (2007).

Louisiana Revised Statute 14:30.1(A)(3) defines second degree murder as the killing of a human being when the offender unlawfully distributes or dispenses a CDS listed in Schedule I through V of the Uniform Controlled Dangerous Substance Law, which is the direct cause of the death of the recipient who ingested or consumed the substance. Heroin is classified as a Schedule I CDS. LSA-R.S. 40:964, Schedule I(B)(11). To support the conviction under LSA-R.S. 14:30.1(A)(3), the record must contain evidence that: (1) the defendant distributed or dispensed heroin to the victim; (2) the victim ingested or consumed the heroin; and (3) the victim died as a direct cause of ingesting or consuming the heroin. **State v. Hano**, 2005-2090 (La.App. 1 Cir. 6/9/06), 938 So.2d 181, 186, writ denied, 2006-1713 (La. 1/26/07), 948 So.2d 164.

For purposes of the Uniform Controlled Dangerous Substances Law, LSA-R.S. 40:961 to 40:995, "distribute" is "to deliver a [CDS] whether by physical delivery, administering, subterfuge, furnishing a prescription, or by filling, packaging, labeling or

---

[8] A motion for post-verdict judgment of acquittal shall be granted only if the evidence viewed in a light most favorable to the state does not reasonably permit a finding of guilt. LSA-C.Cr.P. art. 821(B). A comment to LSA-C.Cr.P. art. 821 clarifies that the test to be applied in ruling on such a motion is "whether a reasonable fact finder must have a reasonable doubt" under the well-settled **Jackson** standard of review.

7

compounding the substance pursuant to the lawful order of a practitioner." LSA-R.S. 40:961(15). "Dispense" is "to deliver a [CDS] to the ultimate user or human research subject by or pursuant to the lawful order of a practitioner, including the packaging, labeling, or compounding necessary to prepare the substance for such delivery." LSA-R.S. 40:961(14). "Deliver" and "delivery" are defined as "the transfer of a [CDS] whether or not there exists an agency relationship." LSA-R.S. 40:961(11). The case law has defined "deliver" as transferring possession or control. **Hano**, 938 So.2d at 186.

Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence not its sufficiency. Accordingly, our role is not to assess credibility or reweigh evidence. **Cockerham**, 231 So.3d at 705. Where a key issue is a defendant's identity as the perpetrator of the crime, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. However, positive identification by only one witness may be sufficient to support a defendant's conviction. **State v. Davis**, 2001-3033 (La.App. 1 Cir. 6/21/02), 822 So.2d 161, 163.

Ali, the victim's girlfriend for the five years preceding his death in 2015, lived in the Marant home at the time of the victim's death. Ali and the victim had both been struggling with heroin addiction since 2014. Ali testified that she and the victim would normally use heroin when they were together, so they could take turns in case one of them had a negative reaction. She was unsure as to the amount of money they spent on daily heroin use, but estimated that the purchase amount was at least forty dollars a day, as they would divide it between the two of them. Ali explained that the victim would obtain and divide up the drugs, and they would borrow money from family members when necessary.

According to Ali, for a period of time Ali and the victim went to New Orleans every day to purchase heroin from Matt Eagle or someone who she identified only as "Bob." However, shortly before the victim's death, they started purchasing heroin from Joe, who Ali identified as the defendant, because he was in Slidell so it was "easier and

8

safer[,]" as they no longer had to travel across the lake and back.[9] Specifically, Ali and the victim were introduced to the defendant around April or May, for the sole purpose of purchasing heroin. Subsequently, the victim made arrangements for drug transactions by calling or texting the defendant. Ali testified that they routinely met the defendant near his house (behind the Antebellum House and Waffle House at the end of a dead-end street), at a gas station, or at a job site. They never had social meetings with the defendant and contacted him only to arrange drug transactions.

Ali further testified that on August 24, 2015, she and the victim bought heroin from the defendant that was "really strong," stronger than it had been previously. She stated that after she used the heroin, she took a shower and fell asleep standing up, which was an unusual occurrence. Ali further stated that the victim fell asleep while sitting in a chair after ingesting his portion of the heroin from that purchase.

On the following day, which was August 25, 2015, the day of the victim's death, the victim went to work, and Ali helped her mother move into a new home. Ali testified that she and the victim talked throughout the day, that the victim planned to purchase heroin that day but was twenty dollars short, and that she borrowed twenty dollars from her mother to give to the victim to make the purchase. At approximately 3:00 p.m., Ali saw the victim for the final time before his death. He met her at the four-way stop sign across the street from her mother's new house. At that point, Ali gave him the twenty dollars to assist with his prearranged heroin transaction with the defendant.

Amanda, the victim's sister, testified that she was in the bathroom when the victim returned home. About fifteen minutes after he got home, she poked her head in his bedroom doorway and called his name, but he did not answer. Amanda assumed that the victim had left again, and left to run errands with her brother Collin.

At approximately 4:20 p.m., Ali texted the victim, but he did not respond. Ali testified that the victim's failure to respond was not normal, adding that he "loved his phone" and always answered his phone. After being unable to reach the victim by phone, Ali rode with her sister to the Marant residence. Ali arrived just as Amanda and

---

[9] Ali and the victim were once arrested for possession of heroin while travelling across the lake in January 2015.

Collin were leaving. As Ali entered the house and opened the bedroom door, she noticed the bathroom light was on. Ali entered the bathroom and saw the victim sitting leaned over on the toilet. When the victim didn't respond, Ali shook him and turned him over. Ali ran to Ms. Bonnie, who told her to call 911. Ali stayed on the 911 call until the first responders arrived. Ali then called Amanda and Collin, and informed them that the victim had overdosed.

Chris Harshbarger, one of the paramedics who arrived on the scene, testified at trial that the paramedics arrived within approximately two minutes of the dispatch, as they were only two blocks away from the Marant residence. Members of law enforcement were already there when the paramedics arrived. Harshbarger noted the presence of lividity, a sign of death that consists of the discoloration of the skin caused by pooling of the blood, on the victim's hips, lower abdominal region, and ankles. Harshbarger explained that lividity can start within thirty minutes to one hour of death. It is initially blotchy and becomes prevalent within about two hours. Harshbarger testified that the location of the victim's lividity was due to his positioning, as he was sitting on a toilet at the time of his death.

John Lizzaraga, a forensic toxicologist for the Louisiana State Police and an expert in forensic toxicology, generated a scientific analysis report for a blood alcohol analysis and a scientific analysis report for a toxicology request. The results of the blood alcohol analysis were negative for the tested for substances (including methanol, acetone, isopropanol, and ethanol). The results of the toxicology analysis were positive for 6-Monoacetylmorphine (a metabolite of heroin), morphine, salicylic acid (a metabolite of aspirin), marijuana metabolites, codeine (commonly present in heroin), an opiate (specified in the urine sample results as hydromorphone), and THC (an inactive metabolite of THC that has no pharmacological effect).

Lizzaraga explained that the results in the instant matter are clearly consistent with a heroin toxicity case. Regarding the presence of salicylic acid, he testified that it was at a normal level (within therapeutic levels for an adult) and not indicative of intoxication of any kind. However, the morphine level was concerning at well over 200 nanograms per milliliter. Lizzaraga testified that the presence of hydromorphone in the

10

victim's urine sample, as opposed to the blood sample, indicated previous use of the compound though it was not flowing through the victim's system at the time the sample was taken. Though multiple toxicity could not be completely ruled out,[10] there was no indication of multiple toxicity. After Lizzaraga's testing was completed, the reports were given to the coroner to make a determination as to the victim's cause of death.

Dr. Michael Defatta, the Chief Deputy Coroner and Chief Pathologist for the St. Tammany Parish Coroner's office and expert in forensic pathology, reviewed the autopsy report and certified the death certificate in this case. The final diagnoses listed on the victim's autopsy include: (1) heroin toxicity; (2) pulmonary congestion and edema (a common finding in death, particularly with heroin toxicity cases, as the lungs become heavier and stop working properly, the blood flow slows down, and fluid accumulates in the lungs); and (3) no evidence of trauma. Heroin toxicity is identified as the cause of death. Dr. Defatta testified that such a ruling is common in cases when the toxicology is positive for morphine, specifically 6-Monoacetylmorphine, which is unique to heroin.

Detective Jeremy Bertucci of the SPD, Criminal Investigations Division, Major Crimes Unit, a digital forensics examiner and expert in digital forensics, performed a digital forensic examination of the victim's cell phone. Detective Bertucci and Detective Esque testified regarding the phone records in this case. On the day of the victim's death, he began texting the defendant that morning.[11] Specifically, at 8:17 a.m., the victim sent the defendant the following text message: "You think you can do that for me today[?]" The defendant replied, "Do what?" The defendant later text messaged "Probably doing the same thing as yesterday[.]" The victim replied, "Well I'll call u when I get off to see if anything popped off[.]"

---

[10] Multiple toxicity could not be ruled out because of the possible presence of drugs that were not tested for, such as synthetic opiates new on the market. However, it was further noted approximately 150 different compounds consisting of typical street drugs, many prescription drugs, and over the counter drugs were screened for in this case.

[11] Detective Bertucci testified that the time stamps on the phone records were five hours ahead of central standard time, and were recorded in military time as opposed to civilian hours. The times cited herein were converted by Detective Bertucci.

The victim and Ali were also communicating during the day. At 9:18 a.m., the victim sent Ali a text message stating, "Yea and if we do end up getting some tonight it we [sic] will fight to make it the last[.]"

At 12:32 p.m., the victim asked the defendant, "Can you score for me or are you going to re up[?]" Minutes later, the defendant responded with two text messages. The first read, "No, bob got popped. Depends on what u need[.]" The second stated, "It's going to b the same, small but good[.]" The victim responded "Yea that's fine bro[.]"

At 12:40 p.m., the victim sent a text message to Ali that read, "He said he can get us a 40 but it's ganna be small again idk how we ganna split it[.]" Ali and the victim agreed that they would tell the defendant that they wanted a fifty-dollar amount instead, and Ali would borrow twenty dollars from her mother. At 1:19 p.m., the victim asked the defendant, "Is it too late to make it a 50[?]" The defendant replied, "No." The victim then made arrangements with Ali to pick up the twenty dollars, informing her that around 3:00 p.m., he would probably be off from work. At 3:14 p.m., the victim text messaged the defendant, "On my way[,]" and the defendant replied, "K[.]" At 3:24 p.m., the victim text messaged the defendant, stating "Bout to pull in the hood[.]"

At 4:35 p.m., Ali text messaged the victim, "Wyd[?]" She never received a response. Detective Esque testified that he had no reason to believe that the victim met with or made arrangements with any individual other than the defendant on the day of the victim's death. The victim's residence, Ali's mother's new residence, and the defendant's residence were all located within a 15.4 mile radius.

During the cross-examination of Detective Bertucci, testimony was elicited to show that the victim also communicated with another dealer, Eagle. Specifically, on August 24, the victim sent Eagle a text message at 5:20 p.m. asking, "Can U get anything[?]" The victim and Eagle made failed arrangements to meet that night "off old Spanish trail[.]" The next morning, the day of the victim's death, the victim text messaged Eagle, "Thanks for blowing me off[.]" Eagle later replied, "Hey I'm sry bout last nite. My battery died ...Ima be making another run today if ya wanta go. Its flame as hell [sic] too." Eagle further indicated that he would be leaving "Prolly round 2 or

12

3." However, the victim replied, "I won't be off by that time f***[.]" The victim then told Eagle that he was not sure what time he would be off but indicated that it would be, "probably around 4[.]" Eagle replied, "I might still be around" and later texted, "Let me know wen ya off. We prolly not going to leave til 4 to [4:30.]" Detective Bertucci testified that the victim missed several subsequent calls from Eagle that day, August 25, but held a seven-minute outbound conversation with Eagle at approximately 3:46 p.m. that afternoon, the final communication with Eagle before the victim's death.

Detective Bertucci testified that two phone numbers found in the victim's phone were associated with the name "Matt." One was not saved to the contacts in the victim's phone, but was a "frequent contact." Text messages between the victim and the unsaved number indicated that it belonged to Matt Eagle. The text messages quoted above were exchanged with this unsaved phone number. The other phone number associated with the name "Matt" was saved to the contacts in the victim's phone under the name "Matt." The phone calls the day of the victim's death, including the seven-minute outbound conversation referenced above, were with the phone number saved as "Matt." Although Detective Bertucci testified that he believed that both phone numbers belonged to Matt Eagle, the record does not affirmatively establish that both phone numbers belonged to the same individual.

Ali made unsuccessful attempts during the investigation to assist as a confidential informant. While Ali did not make arrangements with the defendant for a controlled buy, she stated at trial that she discussed the incident in question with the defendant. She specifically testified that the defendant confirmed that he had provided the victim with heroin on the day in question.[12] Ali further emphasized that she was one hundred percent certain of her pretrial identification of the defendant in a photographic lineup as the heroin dealer that she and the victim were using at the time of the victim's death. Ali also identified the defendant in court.

During the defendant's post-arrest interview, he admitted to dealing drugs to others for money. The defendant stated that he had five to ten customers. He noted

---

[12] Ali testified that she did not tell the police about the follow-up conversation that she had with the defendant because she was afraid to disclose the information. She also testified that the defendant offered to provide her with heroin after the incident.

13

that some of the buyers were repeat customers, while others were one-time purchasers. He indicated that he sold enough drugs to take care of his own drug habit and that he worked to make money for his living expenses. The defendant also admitted to knowing people who died from drug use. After a lengthy attempt to elicit additional information, the defendant ultimately requested an attorney, and the interview ceased.

An appellate court is constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases; that determination rests solely on the sound discretion of the trier of fact. The trier of fact may accept or reject, in whole or in part, the testimony of any witness. The fact that the record contains evidence that conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. **Hano**, 938 So.2d at 187.

Herein, the jury heard the testimony and had the opportunity to review the phone records regarding the victim's communications around the time of his death and rejected the hypothesis that the heroin that caused the victim's death was purchased from a dealer other than the defendant. Ali unequivocally testified that she and the victim were purchasing heroin from the defendant at the time of the victim's death, that the victim arranged to and did purchase heroin from the defendant on the date of his death, and that she had a subsequent conversation with the defendant wherein he confirmed providing the heroin to the victim on the day in question. The phone records in this case overwhelmingly corroborate Ali's testimony that the victim purchased the heroin at issue from the defendant. The State elicited testimony to show the victim's actions on the day in question that led to his death, from when the victim arranged the transaction with the defendant, obtained money from Ali, and met the defendant, to when he arrived home briefly before ingesting the heroin and losing consciousness. Specifically, the record reflects a 3:24 p.m. text message from the victim to the defendant indicating that he was about to "pull in," that the victim failed to respond to his girlfriend's text message at 4:20 p.m., and was found dead at approximately 5:00 p.m. Thus, the jury could have reasonably concluded that the victim made and fulfilled arrangements with the defendant to purchase the heroin that caused his death.

14

In reviewing the evidence presented at trial, we cannot say that the jury's determination was irrational under the facts and circumstances presented. See **Ordodi**, 946 So.2d at 662. Based on the record before us, the jury could have concluded that (1) the defendant distributed heroin to the victim, (2) the victim ingested or consumed the CDS, and (3) the victim died as a direct cause of ingesting or consuming the CDS. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). A court of appeal impinges on a fact finder's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law in accepting a hypothesis of innocence that was not unreasonably rejected by the fact finder. See **State v. Mire**, 2014-2295 (La. 1/27/16), 269 So.3d 698, 703 (per curiam). After a thorough review of the record, we are convinced that a rational trier of fact, viewing the evidence presented in this case in the light most favorable to the State, could find that the State proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder and the defendant's identity as the perpetrator. Thus, we find that assignments of error numbers one, two, and three lack merit.

## ASSIGNMENTS OF ERROR NUMBERS FOUR AND FIVE

In assignment of error number four, the defendant argues that the trial court erred in denying his motion to sever the second-degree murder charge on count one from the drug offenses on counts two, three, and four. In assignment of error number five, the defendant argues that the trial court, having declined to sever the offenses, erred in allowing evidence of the September 2015 and November 2015 drug transactions with respect to the second-degree murder charge.

Pursuant to LSA-C.Cr.P. art. 493, two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected

15

together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial. If it appears that a defendant or the State is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires. LSA-C.Cr.P. art. 495.1.

In ruling on a motion for severance, the trial court should consider a variety of factors in determining whether or not prejudice may result from the joinder: (1) whether the jury would be confused by the various counts; (2) whether the jury would be able to segregate the various charges and the evidence; (3) whether the defendant could be confounded in presenting his various defenses; (4) whether the crimes charged would be used by the jury to infer a criminal disposition; and (5) whether, considering the nature of the offenses, the charging of several crimes would make the jury hostile. A severance need not be granted if the prejudice can effectively be avoided by other safeguards. In many instances, the trial judge can mitigate any prejudice resulting from joinder of offenses by providing clear instructions to the jury. The State can further curtail any prejudice with an orderly presentation of evidence. **State v. Friday**, 2010-2309 (La.App. 1 Cir. 6/17/11), 73 So.3d 913, 928-29, writ denied, 2011-1456 (La. 4/20/12), 85 So.3d 1258.

A motion for severance is addressed to the sound discretion of the trial court, and its ruling should not be disturbed on appeal absent a showing of an abuse of discretion. A defendant in any case bears a heavy burden of proof when alleging prejudicial joinder of offenses as grounds for a motion to sever. Factual, rather than conclusory, allegations are required. **Friday**, 73 So.3d at 929. Evidence of a crime other than the one charged, which may not, for some reason, be admissible under **Prieur**[13] in a separate trial of that charge, does not prevent the joinder and single trial of the charge of multiple crimes, if the joinder of the crimes is otherwise permissible. Finally, there is no prejudicial effect from the joinder of offenses when the evidence of each is relatively simple and distinct, so that the jury can easily keep the evidence of

---

[13] **State v. Prieur**, 277 So.2d 126 (La. 1973).

16

each offense separate in its deliberations. **State v. Murphy**, 2016-0901 (La.App. 1 Cir. 10/28/16), 206 So.3d 219, 227.

In support of assignments of error four and five, the defendant argues that the danger inherent in declining to sever the offenses and in allowing testimony concerning drug transactions unrelated to count one was evident at the pretrial stage and resulted in an improper verdict. Citing **State v. Morris**, 99-3075 (La.App. 1 Cir. 11/3/00), 770 So.2d 908, 914, writ denied, 2000-3293 (10/12/01), 799 So.2d 496, cert. denied, 535 U.S. 934, 122 S.Ct. 1311, 152 L.Ed.2d 220 (2002), the defendant maintains that the trial court failed to consider whether the crimes charged would be used by the jury to infer a criminal disposition, and whether, considering the nature of the offenses, the charging of several crimes would make the jury hostile. The defendant argues that the "bad acts" that formed the basis for the other counts occurred after the sale resulting in the victim's death. The defendant also cites to LSA-C.E. art. 403, contending that the trial court's reasons for judgment do not contain an "interest balancing" analysis with respect to the second-degree murder charge, because the subsequent CDS transactions had no evidentiary value with respect to the second-degree murder charge.

However, as **Morris** is distinguishable from the instant case, the defendant's reliance on **Morris** is misplaced. In **Morris**, the defendant claimed the trial court erred by refusing to sever the charge of felon in possession of a firearm from the remaining offenses. He claimed joinder of that offense was improper and prejudicial because it allowed the jury to hear the otherwise inadmissible evidence that he was a convicted felon. **Morris**, 770 So.2d at 913. No such evidence was presented in this case. At any rate, in **Morris**, we found that the defendant failed to establish that the evidence of the firearms charge was likely to confuse the jury and make it unable to segregate the charges and evidence because the charges and evidence pertinent to each of the crimes charged were easily distinguishable. **Morris**, 770 So.2d at 914. We also found that evidence of the defendant's prior conviction had not confounded his defenses of alibi and discrediting the testimony of the State's witnesses. **Morris**, 770 So.2d at

17

914.[14] Thus, this court found no merit in the defendant's claim that the trial court erred therein in refusing to sever the charge of felon in possession of a firearm. **Morris**, 770 So.2d at 915.

In the instant case, all of the charged offenses were triable by the same number of jurors. The trial court instructed the jury that the defendant was on trial only for the offenses charged and that the jury was not permitted to find him guilty of the instant charges because he may have committed another offense. The trial court further instructed the jury as to the separate elements for each of the offenses and the State's burden of proving each element beyond a reasonable doubt. Prior to instructing the jury as to the elements of each offense, the trial court stated:

> The defendant is charged with four counts or offenses in this case. These are separate charges or counts and should be considered as such.
>
> You must make a separate determination on each count and reach a separate, independent verdict as to each count.
>
> You are to consider the evidence presented on each count and determine a proper verdict as to that particular count.

We find the offenses were properly joined pursuant to LSA-C.Cr.P. art. 493. The defendant has offered only conclusory allegations for severance and failed to meet the burden of establishing prejudicial joinder. The offenses in this case are readily distinguishable from each other, and they were presented to the jury in a simple, orderly manner. Further, the jury was carefully and thoroughly instructed prior to deliberations. The jury's ability to consider the evidence in support of the offenses in a distinct manner was demonstrated by the fact that the jury's concurrence as to one of the counts differed from the others. Moreover, there is nothing in the record to suggest that the State joined the offenses to show the defendant's criminal propensity or that the jury became hostile because of the joinder. As the defendant has not shown that he was prejudiced by the joinder of the offenses, we find no abuse of discretion in the trial court's denial of the motion to sever. Thus, as the joinder of the offenses is permissible in this case, evidence of each offense was properly admitted at trial. See

---

[14] This court also conducted a harmless error analysis in **Morris**, in the event the trial court erred in denying the motion to sever therein, and found that any possibility that the jury was prejudiced against defendant because of his prior conviction was so remote as to render the verdicts surely unattributable to the evidence. **Morris**, 770 So.2d at 915.

**Murphy**, 206 So.3d at 227. Assignments of error numbers four and five are without merit.

## ASSIGNMENT OF ERROR NUMBER SIX

In assignment of error number six, the defendant argues that the mandatory life sentence imposed on count one is constitutionally excessive and the case should be remanded for resentencing. While the defendant cites and block quotes a section of **State v. Dorthey**, 623 So.2d 1276, 1280 (La. 1993), in support of this assignment of error, he did not present any analysis or other briefing on this issue except to twice repeat the claim that the sentence is "constitutionally excessive." Thus, the defendant failed to develop an argument in support of this assignment of error. Further, the record before this Court does not contain a copy of a motion to reconsider sentence or evidence that defendant orally moved for reconsideration of the sentence. Finally, the defendant did not object[15] to the sentence at the time of its imposition.

Assignments of error that are neither briefed nor argued are considered abandoned. Uniform Rules, Courts of Appeal, Rule 2-12.4(B)(4); **State v. Gordon**, 2004-0633 (La.App. 1 Cir. 10/29/04), 896 So.2d 1053, 1065, writ denied, 2004-3144 (La. 4/1/05), 897 So.2d 600. Restatement of an assignment of error in brief is nothing more than a listing of the assignment and certainly does not constitute briefing of the assignment. **State v. Williams**, 632 So.2d 351, 353 (La.App. 1 Cir. 1993), writ denied, 94-1009 (La. 9/2/94), 643 So.2d 139.

Moreover, the life sentence imposed was the minimum sentence statutorily permissible. LSA-R.S. 14:30.1(B). Louisiana Code of Criminal Procedure article 881.1(A)(1) requires a defendant or the State to make or file a motion to reconsider sentence within thirty days of sentencing unless the trial court sets a longer period of time at the time of sentencing. Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the State or the defendant

---

[15] Not only did the defendant not object when the sentence was imposed on count one, after his habitual offender adjudication and resentencing on counts two, three, and four, counsel for the defendant stated: "Thank you, Your Honor, and we would state specifically for the record that we will not be asking to reconsider or appealing the sentencing in this matter. We will have the sentence by agreement, however we are at this time filing a motion for appeal and designation of record as to the underlying convictions."

from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review. LSA-C.Cr.P. art. art. 881.1(E). In the instant case, the defendant failed to file a motion to reconsider sentence. Therefore, assignment of error number six is not reviewable. **State v. Lutz**, 2017-0425 (La.App. 1 Cir. 11/1/17), 235 So.3d 1114, 1134, writ denied, 2017-2011 (La. 8/31/18), 251 So.3d 411.

## PATENT ERROR REVIEW

On appeal, this court routinely reviews the record for error patent. Pursuant to LSA-C.Cr.P. art. 920(2), in conducting a patent error review, this court shall consider "an error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." The jury's verdict is part of the pleadings and proceedings that this court must review for errors. **State v. Keys**, 328 So.2d 154, 157 (La. 1976); **State v. Anderson**, 2017-0927 (La.App. 1 Cir. 4/6/18), 248 So.3d 415, 418-19, writ denied, 2018-0738 (La. 3/6/19), 266 So.3d 901. Herein, the written polling of the jury shows that the verdicts of guilty as charged were unanimous on counts one, second degree murder, in violation of LSA-R.S. 14:30.1; count two, distribution of a Schedule I controlled dangerous substance (heroin), in violation of LSA-R.S. 40:966(A)(1); and count four, possession with intent to distribute a Schedule I CDS (heroin), in violation of LSA-R.S. 40:966(A)(1). However, eleven of the twelve jurors found the defendant guilty as charged regarding count four, possession with intent to distribute a Schedule III CDS (buprenorphine), in violation of LSA-R.S. 40:968(A)(1).

In the recent decision of **Ramos v. Louisiana**, 590 U.S. ___, ____, 140 S.Ct. 1390, 1397, 206 L.Ed.2d 583 (2020), the United States Supreme Court overruled **Apodaca v. Oregon**,[16] 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), and held that the right to a jury trial under the Sixth Amendment of the United States Constitution, incorporated against the States by way of the Fourteenth Amendment of the United States Constitution, requires a unanimous verdict to convict a defendant of a serious offense. Thus, the **Ramos** Court declared non-unanimous jury verdicts unconstitutional. The **Ramos** Court further indicated that its ruling applied to those

---

[16] Oregon's non-unanimous jury verdict provision of its state constitution was challenged in **Apodaca**. **Johnson v. Louisiana**, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), decided with **Apodaca**, upheld Louisiana's then-existing constitutional and statutory provisions allowing nine-to-three jury verdicts in criminal cases.

defendants convicted of felonies by non-unanimous verdicts whose cases are still pending on direct appeal. **Ramos**, 140 S.Ct. at 1406. As the verdict on count four in this case was non-unanimous, we hereby set aside the conviction, habitual offender adjudication, and sentence on count four, and remand the case to the trial court for further proceedings.

**CONVICTION AND SENTENCE ON COUNT ONE AFFIRMED; CONVICTIONS, HABITUAL OFFENDER ADJUDICATION, AND SENTENCES ON COUNTS TWO AND THREE AFFIRMED; CONVICTION, HABITUAL OFFENDER ADJUDICATION, AND SENTENCE ON COUNT FOUR VACATED; REMANDED FOR FURTHER PROCEEDINGS.**